U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 FEB 25 PM 3: 07

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA       )
                               )
          v.                   )     Case No. 5:13-cr-93
                               )
KIRT WESTCOM                   )

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(Doc. 23)

This matter came before the court on January 2 and 22, 2014 for an evidentiary hearing on Defendant Kirt Westcom's Motion to Suppress Evidence (Doc. 23) obtained from a May 29, 2013 warrantless search of his residence. Defendant contends that the government cannot establish his consent to the search was voluntary. The government opposes the motion, arguing that Defendant's consent was voluntary and that law enforcement's advice to Defendant that he had only two options—consent or a search warrant—was neither coercive or deceitful.

Defendant is charged in a two count Superseding Indictment with conspiracy to distribute marijuana involving 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana and possession of a firearm while being an unlawful user of a controlled substance.

The government is represented by Assistant United States Attorney Heather E. Ross and Assistant United States Attorney Kevin J. Doyle. Defendant is represented by Katina F. Ready, Esq.

## I.      Findings of Fact.

### A.      The Initial Search of Defendant's Residence.

Defendant and his wife, Billie Westcom, reside at 262 Egypt Road in East Fairfield, Vermont, where they operate a farm. Defendant's father, Harold Westcom, lives at 264 Egypt Road, accessed by a common driveway with Defendant's residence.

Harold Westcom shares ownership with his son of a large barn that is approximately eighteen yards from Harold Westcom's residence and approximately 120 yards from Defendant's residence. The barn includes a milkhouse that is on Harold Westcom's property. Photographs of the barn introduced into evidence reveal that it clearly appears to be associated with Harold Westcom's residence.

On May 29, 2013 between 7:00 and 7:30 p.m., six law enforcement agents in two unmarked vehicles arrived at Defendant's single family residence. Three agents approached the residence while the remaining law enforcement officers stood outside their vehicles in Defendant's driveway approximately 75 to 100 feet from the front door of Defendant's residence. These remaining officers were visible from the front door of the residence.

Drug Enforcement Administration ("DEA") Task Force Agent Robert Sylvia, a member of the Chittenden County Sheriff's Office, took the lead on the initial approach to Defendant's residence and was accompanied by DEA Task Force Agent Daniel Merchand and DEA Task Force Agent Michael Grindle. The men were dressed in plain clothes and carried holstered firearms. Agent Sylvia knocked on the front door, and Billie Westcom answered. Agent Sylvia asked to speak to Defendant. Billie Westcom retreated from the front door, called out to her husband, and Defendant subsequently appeared at the front door and stepped out onto a large, covered porch where the agents were waiting.

Thereafter, Agent Sylvia stood within arm's length of Defendant. He was aware from his investigation that Defendant drank alcohol and possibly used drugs. He testified that he had extensive experience with people under the influence of alcohol, but claimed he could not smell intoxicants. Agent Merchand, who was standing behind Agent Sylvia, however, could smell the odor of intoxicants emanating from Defendant from several feet away. Both agents believed that Defendant may have been under the influence of either alcohol or narcotics or both, and Agent Sylvia noticed that Defendant's eyes were "pretty glossy." (Tr. 1/2/14 at 14:4-7.)

2

Billie Westcom, who herself had three or four beers that evening, remained in the doorway and watched the encounter. It was her impression that Defendant was intoxicated because she had watched him drink alcohol that evening and stumble as he walked to the front door. Defendant also testified that he had been drinking.

Agent Sylvia identified the DEA agents to Defendant and showed Defendant his DEA credentials. He expressed concern regarding whether Defendant understood him and asked Defendant if he was drunk or high. Defendant responded by laughing and saying he was "fine." *Id.* at 15:3-12. Agent Sylvia suggested to Defendant that "later on someone might say that they were intoxicated . . . and they didn't want to talk to the police." *Id.* at 15:5-8. He, however, did not pursue the issue further and concluded that Defendant could understand him sufficiently to proceed.

The DEA agents explained to Defendant the nature of the investigation which led them to Defendant's residence that evening. Agent Sylvia told Defendant they had gleaned information in the course of their activities that day that indicated that Defendant was engaged in marijuana trafficking, that he had become a "focal point" of their investigation, (Tr. 1/22/14 at 5:6), and that marijuana would be found in his residence. In response, Defendant laughed and said, "no, there's nothing in there and that there's just some stuff for my head." (Tr. 1/2/14 at 17:15-19.) Agent Sylvia understood this to mean drugs for personal use.[1]

Agent Sylvia informed Defendant that the DEA had executed a number of search warrants that day in Franklin County as part of their marijuana trafficking investigation, including at Jeffrey Donna's store, and asked Defendant if he had heard about it. Billie

---

[1] The court does not credit Agent Sylvia's further testimony that Defendant admitted to having "just a few ounces" in the residence while they talked on the front porch. (Tr. 1/2/14 at 17:21.) This alleged admission was not included in the warrant application and Agent Merchand, who was present, recalled Defendant only "saying it wasn't a large amount, it was a smaller amount because what he was saying was I'm not this huge, large scale dealer. And . . . that's what he was talking with Agent Sylvia about. And basically said it was there for his own personal use." (Tr. 1/22/14 at 5:20-24). Billie Westcom and Defendant credibly testified that Defendant's statements regarding the precise quantity of marijuana that would be found in the residence were made after the agents entered the residence.

3

Westcom responded that they had heard about it. When the agents questioned her regarding her source of information, she declined to answer them.

Agent Sylvia advised Defendant that he had only two options. Defendant could grant consent for the agents to search his residence or Agent Sylvia would seize the residence, obtain a warrant, and search the residence that evening. Defendant credibly testified that it was his "understanding it was either let them in or they were going to haul [Defendant and Billie Westcom] away and get a warrant and search it anyways" and that it was his "understanding" based on what Agent Sylvia "told" him that the agents "were going to [search] that day no matter what." (Tr. 1/22/14 at 36:5-25.) Agent Sylvia did not advise Defendant of his right to refuse consent or indicate that a search warrant may or may not be granted, although Agent Sylvia has been denied search warrants in the past.

The conversation on the front porch lasted no more than fifteen minutes. The agents did not raise their voices, although Agent Sylvia confronted Defendant with his belief that Defendant was "deeply involved" in marijuana trafficking and with his certainty that incriminating evidence would be found in Defendant's home. (Tr. 1/2/14 at 17:10-21.) Other than their presence, the agents made no display or threats of physical force. Contrary to Defendant's testimony, the court does not find that he asked for a lawyer while on the front porch.

In response to Agent Sylvia's presentation of the option to either consent or have his residence seized until a warrant issued, Defendant told Agent Sylvia to "do what you have to," *id.* at 19:2, and waived the agents inside. At that point, Agent Merchand indicated that any agents who remained in the driveway should follow him into the residence and they did so.

Agent Sylvia did not solicit Billie Westcom's consent to the search, although she remained present throughout the encounter. Upon entry into the residence, Agent Sylvia did not ask Defendant to sign a written consent form because he "[d]idn't need to." *Id.* at 37:22-38:1. Agent Sylvia testified that although he could have drafted a written consent form, he "very often" performs warrantless searches of residences without written

consent and that it is "[f]requently" his "practice" to search a residence based solely on verbal consent for "logistical, tactical decisions, short timeframe, the targets of the investigation, the seriousness of what we're looking for. A variety of reasons." *Id.* at 59:7-19.[2]

Inside the residence, Agent Merchand noticed deer heads mounted on the living room wall and asked Defendant if there were any weapons in the residence. Defendant admitted that there was a loaded shotgun in his bedroom. Agent Merchand went into Defendant's bedroom with several other agents and retrieved the weapon. While in the bedroom, Agent Merchand observed marijuana paraphernalia, some marijuana shake, and "a little small bud." (Tr. 1/22/14 at 9:20-21.) He also observed an open safe in a closet with an odor of marijuana.

In the foyer of the residence, Agent Sylvia again questioned Defendant about the amount of marijuana that would be found in the home, and Defendant continued to "say that there's nothing in here [and] he didn't know why we would be there and just said that the only other thing he had was upstairs [and] was a few marijuana plants." (Tr. 1/2/14 at 21:1-5.) Either during this conversation or shortly thereafter, additional agents entered the residence after being summoned by Agent Sylvia from nearby agencies. Eventually, there were fourteen agents involved in the search of Defendant's home.

Defendant motioned to the agents as he walked upstairs, and Agents Sylvia and Grindle followed him. There, they found a closed door with a combination padlock. Defendant manipulated the combination and opened the door, which the agents entered. Inside the room, Agent Sylvia observed that "there was kind of the remnants of a small marijuana grow [operation]. There was some . . . wood debris, looked like some things had been damaged or broken, some kind of little construction project I guess. There was a small or medium size closet off to my right that, again, had a couple marijuana plants and the remnants of what was maybe a little bit bigger marijuana grow." *Id.* at 22:21-

---

[2] When asked by the court what would be a tactical reason for not getting written consent to search a residence, Agent Sylvia responded that in the case of a "quick search if we're looking for one particular item to make it a quick search. I can't think of a specific example or case. But we'll do it frequently." (Tr. 1/2/14 at 59:20-60:1.)

23:3. Agent Grindle confronted Defendant with "the true investigation, which was not about a couple of marijuana plants in his upstairs bedroom," *id.* at 23:21-22, and provided details of the "bigger investigation" in which they suspected Defendant was involved. *Id.* at 24:1-2. In response, Defendant appeared fearful. According to Agent Sylvia, Defendant "said he [thought] he should talk to a lawyer," *id.* at 24:12-13, twice "asked for a lawyer," *id.* at 38:19-21; 39:4-5, and said he "would need one." *Id.* at 39:16-17. Agent Sylvia, however, also testified that Defendant "never asked to speak with an attorney." *Id.* at 39:21. The court finds that Defendant did in fact express his desire to speak to a lawyer at least twice. Agent Sylvia did not provide Defendant with an opportunity to consult with a lawyer because "[t]here was no opportunity for him to speak with an attorney. We seized the house. He could have left. He didn't." *Id.* at 39:10-12. Thereafter, however, Agent Sylvia and Agent Grindle stopped questioning Defendant, although they continued their search.

Defendant returned to the first floor of the house, and he and his wife were escorted out onto the front porch where an agent remained with them until Billie Westcom complained of the cold and the couple was allowed to re-enter their residence. During this time period, Defendant and his wife were advised that they could not answer their telephone which was ringing.

At some point, Defendant began to talk to Agent Merchand. According to Agent Merchand, Defendant "was upset that [the agents] were there at the house and he was basically telling [Agent Merchand that he was] not a large scale marijuana dealer, (Tr. 1/22/14 at 26:12-14), that the marijuana he had was for his "head," and that he and his wife "basically smoked marijuana on a daily basis." *Id.* at 11:20-24. Defendant asked Agent Merchand "about the legality of the search and whether or not [the agents] needed a warrant." *Id.* at 12:6-7. Agent Merchand told Defendant that he had allowed them to search and that if he wanted them to stop searching they would. He explained that the agents would go to a judge and apply for a warrant and that whether they obtained one would be based upon the information they gave to a judge in an affidavit. Defendant asked Agent Merchand whether he should talk to a lawyer. Agent Merchand told

Defendant that he could not give him legal advice but that he could call a lawyer if he wanted to. At that point, Agent Merchand "became weary of what [Defendant] was saying," *id.* at 23:8, and summoned Agent Sylvia and Agent Grindle downstairs to talk to Defendant.

When Agents Sylvia and Grindle arrived downstairs, Agent Merchand explained to them that Defendant was questioning the legality of the search and asking for a lawyer. Agent Sylvia testified that he "in a nutshell, re-explained . . . the conversation I had with him on the porch [that] I have only two options, a search warrant or consent, and that he had already given consent which is why we were searching his house." (Tr. 1/2/14 at 27:1-4.) At that point, Agent Sylvia "started to get uncomfortable with the fact that [Defendant] was questioning [the search] and [he] couldn't quite answer him fully." *Id.* at 27:6-8. Agent Sylvia testified that it was his decision to obtain a search warrant. However, Defendant credibly testified that he eventually demanded a warrant and only then did the initial search of his residence cease. Agent Merchand corroborated Defendant's version of events, acknowledging that he wrote in his report that "eventually a search of the residence ceased after [Defendant] wanted law enforcement to obtain a warrant." (Tr. 1/22/14 at 22:22-23.)

Agent Sylvia directed the agents to stop searching, froze the residence, and Defendant and his wife were escorted to the living room. In the living room, Agent Merchand advised Defendant and his wife that they could leave their residence but if they stayed, he would remain with them until the search warrant was obtained. Defendant and Billie Westcom decided to remain in their residence with Agent Merchand to await the warrant.

### B. The Search Warrant Application.

Border Patrol Agent Brian Wood provided the affidavit in support of the search warrant based, in part, upon information he obtained from the DEA agents at Defendant's residence. In his affidavit, he did not advise the magistrate judge that Defendant had been presented with two options, either consent to the search or DEA agents would obtain a warrant. He also did not mention Defendant's possible intoxication or that the

initial search of Defendant's residence had ceased because Defendant had questioned the search's legality without a warrant, withdrew his alleged consent, and demanded a warrant.

In his affidavit, Border Patrol Agent Wood indicates that all of Defendant's admissions were made prior to law enforcement making entry into the residence when in fact the only admission Defendant made prior to law enforcement's entry was that the residence contained "just some stuff for my head." (Tr. 1/2/14 at 17:17-18.) The affidavit describes the events of May 29, 2013 as follows:

> On May 29, 2013, TFA Robert Sylvia and another law enforcement officer, TFA Daniel Merchand, approached the house, knocked on the door, and identified themselves as law enforcement. WESTCOM came outside and talked to law enforcement. TFA Sylvia asked if law enforcement could enter the house to search and WESTCOM agreed. WESTCOM said you will find a little bit of marijuana and further stated that he and his wife liked to smoke marijuana. He also stated that he had a loaded shotgun in the house. Law enforcement entered the house and did a protective sweep. During the protective sweep, in plain view on a bureau in the master bedroom, there was a dish containing a bud of suspected marijuana and rolling papers. TFA Grindle also saw a shotgun in the bedroom.
>
> WESTCOM then identified that he had more marijuana upstairs and led law enforcement to a locked room, which he opened. When he opened the door, TFA Sylvia and other law enforcement agents observed what appeared to be a marijuana grow room containing several grow lamps and a couple of plants, [the remainder of this sentence is in handwriting] identified to me as having characteristics consistent with marijuana. WESTCOM identified this room to TFA Merchand as where he kept his "head stash." At that time, law enforcement inquired about his source of supply, and WESTCOM suggested that he wanted to talk to a lawyer. Following that statement, law enforcement froze the scene and sought an application for the instant warrant.

(Doc. 23-1 at ¶¶ 9-10.)

The search warrant affidavit also contained certain historical information regarding the DEA's investigation, including information pertaining to Roy "Opie" McAllister and Jeffrey Donna and their alleged trafficking of large amounts of Canadian marijuana in 2006. With regard to Defendant, the affidavit describes March 2011

information provided by CS-11-138570, referred to in the affidavit as "CS1," to the DEA which is memorialized in a DEA report. The affidavit describes CS1 as someone who "provided information to the DEA for consideration on pending State of Vermont charges and was also compensated for its services during the course of its cooperation" and someone who "has proven to be reliable, accurate, and in many cases, has been independently corroborated by the DEA. CS1 has also made successful purchases of drugs at the direction of the DEA." *Id.* at ¶ 5. The affidavit does not describe when CS1 provided these services or the date, nature, and resolution of his/her pending state court charges.

CS1's information regarding Defendant consists of a statement that on an unspecified date or dates "MCALLISTER and DONNA were a source of supply (SOS) to Kirt WESTCOM of East Fairfield, VT." *Id.* at ¶ 6. CS1 "worked at WESTCOM's farm and provided information about its experiences from in or about 2007 through in or about March 2011." *Id.* CS1 describes how McAllister and Donna made deliveries of marijuana to Defendant during this time period and states that on one unspecified occasion CS1 provided a large amount of U.S. currency to McAllister as partial payment for a marijuana shipment to Defendant. In addition, CS1 reported that in or about January 2011, McAllister brought two large hockey bags containing marijuana to Defendant's farm and gave one of the vacuum-sealed bags to Defendant for his "head." *Id.* at ¶ 7.

In his affidavit, Border Patrol Agent Wood further avers that he has reviewed reports indicating that, in the summer of 2011, DEA monitored and recorded numerous conversations between CS1 and Defendant including a July 7, 2011 conversation in which CS1 asked Defendant if Defendant "had time to 'dig it out,' referring to the fact that WESTCOM typically hid his marijuana in the hay bales [to which] WESTCOM responded that he had not and told CS1 to return the next day." *Id.* at ¶ 8.

### C.    The Second Search of the Residence.

Magistrate Judge Conroy issued the search warrant at 9:53 p.m. on May 29, 2013 in South Burlington, Vermont. The warrant authorizes a search of "Kirt Westcom's

residence located at 262 Egypt Road Fairfield, Vermont . . . described as a stick built single family dwelling." (Doc. 1-1; Doc. 23-1 at 2.) Agent Sylvia was advised that a search warrant was obtained, although he neither reviewed the search warrant application nor the warrant itself on the night in question. Defendant was also not provided with a copy of the warrant. The agents resumed their search of Defendant's residence, ceasing their activities around midnight.

### D. The Search of the Barn and Milkhouse.

Between 6:00 and 7:00 p.m. on May 29, 2013, a Border Patrol agent approached Harold Westcom's residence and advised him he was going to search his property and that Defendant had granted his permission to do so. Harold Westcom could see agents gathered at Defendant's home and assumed the representation was true. He was not asked for his own consent to search the barn or milkhouse, and he did not provide it. The Border Patrol agent remained with Harold Westcom and his wife while another agent with a canine walked around the property and the barn.

At some point during the evening, Agent Merchand was instructed to enter the milkhouse and photograph some phone numbers that were there. He entered both the milkhouse and the barn, searched them, and photographed what he observed. He did so because he was told that another unnamed agent had obtained Harold Westcom's consent to the search.

Several agents returned to Harold Westcom's residence at approximately 10:30 p.m. that same evening while he was in bed. The agents advised him that they were going to search the barn again. Mr. Westcom responded that it had already been searched with a dog. He asked the agents if they had a warrant, and they did not answer him. He credibly testified that he asked if they would "make it snappy. And one guy, I don't know who he was, made it very clear that he would take as F'n long as he wanted." (Tr. 1/22/14 at 82:3-5.) The agents found a tool shed with a lock on it and advised Mr. Westcom that he could either give them the key or they would cut the lock. Mr. Westcom provided the key.

The search warrant application did not authorize a search of the barn or the milkhouse. There is no evidence that either Defendant or Harold Westcom was asked for or gave consent to search them. The government does not dispute, however, that on May 29, 2013, a search of both of them took place.

The government represents that it will not seek to introduce Agent Merchand's photographs of the barn at trial and will not offer evidence obtained from Defendant's portion of the barn. It is not clear, however, whether the government intends to use any other evidence acquired in the barn or milkhouse during the warrantless search.

### E. Other Facts Relevant to the Suppression Motion.

Defendant is 47 years old and has a twelfth grade education. Since birth, he has suffered from significant hearing loss for which he was prescribed hearing aids during his childhood. He does not typically wear hearing aids as he believes he does not need them for his work as a farmer. There is no evidence that he was wearing hearing aids at the time of his alleged consent. Neither Agent Sylvia nor Agent Merchand noticed a problem with Defendant's hearing, and Agent Sylvia does not remember whether in the course of the evening's events, Defendant asked Agent Sylvia to repeat himself. Defendant speaks in a low, gruff tone of voice which is difficult to understand but which is apparently normal for him. The government provided no evidence regarding Defendant's level of intelligence, mental and emotional health, or familiarity with the criminal justice system.

Agent Sylvia testified that he had more recent information regarding Defendant's alleged involvement in marijuana trafficking which he believes gave rise to probable cause to search Defendant's residence. He concedes this information was omitted from the warrant application and describes it as "[i]nformation known to DEA that was current," including information from an informant from "[a]s recently as January 29th of that year," 2013. (Tr. 1/2/14 at 47:7-8; 57:12-17.) The court does not credit Agent

11

Sylvia's testimony on this point without further details of the alleged omitted information.[3]

## II.    Conclusions of Law and Analysis.

### A.    The Government's Burden of Proof.

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *United States v. Simmons*, 661 F.3d 151, 156 (2d Cir. 2011) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks and citations omitted)). "This presumption is rooted in the recognition that 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Simmons*, 661 F.3d at 157 (quoting *United States v. Hassock*, 631 F.3d 79, 84 (2d Cir. 2011)); *see also Groh v. Ramirez*, 540 U.S. 551, 559 (2004) ("[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment[.]") (internal quotation marks, citations, and alterations omitted).

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person." *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006); *see also United States v. McGee*, 564 F.3d 136, 138-39 (2d Cir. 2009) ("A warrantless police search of a defendant's private premises which would otherwise violate the defendant's rights under the Fourth Amendment is lawful if

_____

[3] In its post-hearing submission, the government does not provide any further clarification of this information but, instead, notes that the search warrant affidavit states that it does not include every fact known to law enforcement at the time. Although the affidavit contains this language, it also notes that the information provided is in order to establish probable cause. Accordingly, it is reasonable to assume that if there was recent and reliable information to support probable cause, it would have been included in the affidavit. It is also reasonable to assume that if probable cause existed, law enforcement would have obtained a search warrant for Defendant's residence when it obtained the other search warrants it executed that same day. In any event, post-hearing, the government may not supplement the warrant by vague references to "numerous confidential sources of information." (Doc. 40-1 at 9.)

conducted pursuant to the consent, voluntarily given, of another person who has authority to consent by reason of that person's common authority over or other sufficient relationship to the premises.") (internal quotation marks and citations omitted). Consent cannot "be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). "Thus, when, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *Snype*, 441 F.3d at 131.

"The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2797 (2013) (internal quotation marks and citations omitted). "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).

> [I]t is appropriate to consider the particularities of the situation that is presented in any given case and the possibly vulnerable subjective state of the person who consents. Other pertinent factors include whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, and whether the defendant had knowledge of the right to refuse consent. The individual's age, education, and intelligence; the length of detention; the use of physical punishments or deprivations; and whether the alleged consenting person was advised of his constitutional rights are also relevant factors.

*United States v. Munoz*, 2013 WL 6638922, at *4 (S.D.N.Y. Dec. 18, 2013) (internal quotation marks, citations, footnotes, and alterations omitted).

In this case, the government claims that Defendant freely consented to the search of his residence and that the DEA agents were entitled to rely on that consent until it was unequivocally withdrawn. The problem with the government's argument on this point is twofold. First, the government has adduced at best conflicting evidence of Defendant's sobriety at the time of his alleged consent and scant, if any, evidence that Defendant

understood his rights. Second, the government has adduced no evidence that Defendant's consent was anything other than acquiescence to a show of authority.

## B. The Totality of the Circumstances.

Defendant is an adult male with a high school education and a hearing disability. He works as a farmer on his own land. No other evidence of his employment history was proffered. The government also proffered no evidence regarding Defendant's intelligence, mental or emotional state, or prior experience with the criminal justice system. *See United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986) (considering in challenge to voluntariness of consent to search apartment defendant's "experience with law enforcement"); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (concluding defendant "capable of giving a voluntary consent" when defendant had two prior convictions and thus was "no 'newcomer to the law'") (quoting *United States v. Watson*, 423 U.S. 411, 424-25 (1976)); *see also United States v. Thompson*, 2013 WL 5232577, at \*4 (D. Conn. Sept. 17, 2013) (evaluating defendant's "personal characteristics," including that he was "very familiar with law enforcement," to conclude his consent to search apartment voluntary).

Agent Syliva was aware that Defendant had a history of alcohol and potential drug use when he approached Defendant's residence and immediately suspected that Defendant might be under the influence based on what he observed. "[C]ourts determining the voluntariness of a consent must assess whether the individual was . . . under the influence of drugs or alcohol at the time the purported consent was given." Wayne R. LaFave, 2 Crim. Proc. § 3.10(b) (3d ed.) Consent is involuntary when a defendant is under the influence of drugs or alcohol to the extent that he or she cannot understand the nature, purpose, and consequences of consent and the right to refuse it. *See Schneckloth*, 412 U.S. at 224, 227 (explaining that "a person [who] is unconscious or drugged or otherwise lacks capacity for conscious choice" cannot be capable of voluntarily consenting or confessing); *see also United States v. Taylor*, 736 F.3d 661, 669-70 (2d Cir. 2013) (concluding statements involuntary when defendant ingested

Xanax prior to interrogation and during interrogation "was in and out of consciousness . . . and in a trance or a stupor most of the time when not actually asleep").

Here, the evidence establishes that Defendant appeared to understand the nature and purpose of the agents' investigation. He answered some of the agents' questions, primarily in an effort to assure them he was not a major dealer and possessed marijuana only for his personal use. He understood the agents were interested in his alleged involvement with marijuana trafficking and whether evidence of that activity would be found in his home. He could walk without assistance, including up and down stairs, and did not slur his speech. The agents did not threaten Defendant with physical force, handcuff him, tell him he would be arrested, or question him at length.

On the other hand, other facts and circumstances cast doubt on the voluntariness of Defendant's consent. In the early evening hours, Defendant was unexpectedly confronted at his home by several DEA agents with additional agents waiting and visible in his driveway. *See United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) (noting the "presence" of officers as a "show of force"). Agent Sylvia identified himself, showed Defendant his DEA credentials, and informed him that the agents had already searched a number of homes and businesses in Franklin County and fully intended to search Defendant's residence that evening through one of two options: consent or a warrant. Agent Sylvia described his investigation into marijuana trafficking in the area and advised Defendant that information he gleaned that day indicated Defendant was involved and that evidence of marijuana trafficking would be found in Defendant's home.

Although not held in physical restraints, after the agents' arrival on their front porch, Defendant and his wife were no longer free to move about their home and were not allowed to answer their telephone. The agents made it clear to both Defendant and his wife that if they remained in their residence, they would do so in the company of a law enforcement officer. While this may have been standard operating procedure for the agents when conducting a search, it supports a conclusion that the agents were demonstrating their authority over Defendant and his residence and that the search of the residence was not proceeding on a purely voluntary basis.

Defendant's level of sobriety was sufficiently concerning to Agent Sylvia that he asked Defendant whether he was drunk or high. When Defendant laughed and stated he was fine, Agent Sylvia pursued the issue no further, although he told Defendant that he was concerned that someone might later question Defendant's willingness to talk with the agents. The agents made no effort to determine how much alcohol Defendant had consumed that evening or whether he was under the influence of marijuana. Agent Sylvia's testimony that he could not smell the odor of intoxicants when standing at arm's length from Defendant is incredible in light of Agent Merchand's testimony that he could smell intoxicants emanating from Defendant from a distance of several feet away.

After Defendant showed the agents his small grow operation in the locked closet, Defendant began questioning the legality of the agents' presence in his residence. He twice asked for counsel thereby exhibiting a concern that he was unable to assert his right to refuse consent to the search without legal assistance. Agent Sylvia did not respond to Defendant's requests. *See United States v. Robinson*, 833 F. Supp. 2d 406, 412 (D. Vt. 2011) (concluding consent to search defendant's person and purse involuntary when defendant "testified that she was suffering withdrawal symptoms and recovering from the flu" and that "she felt confused and thought she should probably have an attorney," which the officers ignored); *see also United States v. Perez*, 506 F. App'x 672, 673-74 (9th Cir. 2013) (noting that in addition to fact that defendant was not advised of his right to refuse consent he "was also denied his right to call his lawyer, despite his repeatedly asking to do so," and thus concluding district court erred in finding defendant's consent to search voluntary).

Defendant exhibited obvious confusion with the circumstances that led his home to be searched and asked Agent Merchand for legal advice. Agent Merchand told Defendant that he could not provide legal advice and then proceeded to explain that the agents would put the information they had found in a warrant application and present it to a judge. At that point, Defendant had already made several incriminating statements including that he and his wife smoked marijuana, had revealed his grow operation to the agents, and had permitted the agents to seize his shotgun. When Agent Merchand

became "weary" of Defendant's questions, he summoned Agents Sylvia and Grindle downstairs to speak to Defendant. After Agent Sylvia spoke to Defendant, he, too, became concerned with Defendant's statements and his inability to answer Defendant's questions. When Defendant demanded a warrant, the initial search ceased.

The search warrant affidavit did not disclose the agents' concerns regarding Defendant's sobriety or his confusion regarding how the agents came to be searching his home. It also fails to disclose Defendant's concerns regarding the legality of the search or his ultimate insistence that the agents obtain a warrant. These facts were clearly relevant to the determination of whether the agents had made a lawful entry into Defendant's residence and whether the evidence obtained thereafter was lawfully obtained through a consent search. The omission of these facts from the warrant application, together with other facts,[4] undermines the credibility of the agents' testimony regarding the level of Defendant's impairment and their conclusion that Defendant fully understood the options presented to him.

On balance, the government has established *some* evidence that Defendant may have possessed the *capacity* to consent when he was presented with Agent Sylvia's two options. It cannot, however, further establish that Defendant's consent was anything other than acquiescence to a show of authority.

"In determining voluntariness . . . knowledge of the right to refuse consent is only one factor in the analysis." *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990); *see also United States v. Garcia*, 56 F.3d 418, 422-23 (2d Cir. 1995) (noting "knowledge of the right to refuse consent" is a "factor" in determining whether consent was voluntary). "Although the Constitution does not require 'proof of knowledge of a

---

[4] These other facts include the affidavit's indication that Defendant told agents about the loaded shotgun before they made entry into the residence when it is undisputed that this statement was made after their entry into the residence and Detective Merchand noticed the deer heads mounted on the wall. The affidavit also inaccurately recites that while on the front porch Defendant told the agents that he and his wife liked to smoke marijuana when Agent Merchand testified that this statement was made to him inside the residence. The agents' warrantless search of the barn and milkhouse and misrepresentation to Harold Westcom that they had secured Defendant's consent for this search also contribute to the court's credibility determinations.

right to refuse as the *sine qua non* of an effective consent to a search,' such knowledge [is] highly relevant to the determination that there had been consent." *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (quoting *Schneckloth*, 412 U.S. at 234). Here, when securing Defendant's alleged consent, Agent Sylvia never told Defendant that he had a right to refuse it. *See Isiofia*, 370 F.3d at 231-33 (finding consent involuntary, the court noted law enforcement did not inform defendant of the right to refuse consent); *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) ("[T]he fact that he was not informed of his right to refuse consent to the search, cause us to doubt whether [the defendant] actually consented to this search.").

Proceeding only on Defendant's statement to "do what you have to do," the agents made entry into Defendant's residence. With no concern regarding officer safety or dissipating evidence and with both Defendant and Billie Westcom, the sole occupants of the house, under surveillance, there was ample time, opportunity, and incentive to secure written consent. For tactical reasons, the agents decided to forego this precautionary step even though it would have clearly advised Defendant of his right to refuse consent and would have served to confirm his alleged decision to authorize a search of his residence. *See Puglisi*, 790 F.2d at 243-44 (concluding consent voluntary, the court noted defendant consented only after he was informed he did not have to consent and signed two written consent forms); *Murphy*, 16 F. Supp. 2d at 401 (concluding consent voluntary when the "consent form, which [the defendant] read and which was explained to him before he signed it, gave clear notice of his rights"); *see also United States v. Schaefer*, 519 F. App'x 71, 72 (2d Cir. 2013) (concluding, despite undisputed fact that "agent refused to allow [the defendant] to telephone his brother," that "the totality of circumstances supports [the] finding that the refusal could not reasonably be understood to have coerced [the defendant's] subsequent consent to search, . . . particularly as [the defendant's] consent was given in writing on a form that specifically advised him of his right to refuse consent") (internal citations omitted).

When obtaining Defendant's alleged consent, the agents did not advise Defendant that they would merely *apply* for a search warrant which may or may not be granted.

18

Instead, after presumably falsely advising Defendant that agents had obtained evidence that day which provided probable cause to search his residence, Agent Sylvia presented Defendant with two options, consent or a warrant, with the option of a warrant presented as a mere technicality that would delay the execution of the search and further inconvenience Defendant and his wife while the agents went to obtain it.[5] Defendant's acquiescence in the face of this show of authority was evidenced by his statement that the agents should "do what they had to do," which reflected his submission, not his consent.

### C.    Whether a Search Warrant Was Inevitable.

The government argues that Agent Sylvia's presentation of the two options nonetheless comports with the Fourth Amendment because he had an objectively reasonable belief that a search warrant for Defendant's residence would issue. Defendant counters that prior to their entry into his residence, the agents lacked probable cause for the search and thus falsely represented to him that a warrant was inevitable. He challenges the credibility of Agent Sylvia's testimony on several issues and the lack of any evidence that would cure the alleged staleness of the information in the search warrant affidavit.

"[T]he well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion." *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974). Correspondingly, as a "sensible rule and a natural extension of the Supreme Court's holding" in *Bumper v. North Carolina*, 391 U.S. 543 (1968),[6] courts hold "that consent obtained based on a false representation that

---

[5] This approach conflicts with the Supreme Court's "preference for the warrant process" over the "hope of relying on consent or some other exception to the warrant clause that might develop at the time of the search" because "the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotations marks omitted).

[6] In *Bumper*, the Court held that law enforcement's false representation that they had a search warrant was coercive and rendered homeowner's consent involuntary. *Bumper*, 391 U.S. 548, 550.

the police could secure a search warrant is involuntary." *Munoz*, 2013 WL 6638922, at *4 (citing *United States v. Cruz*, 701 F. Supp. 440, 447 (S.D.N.Y. 1988)). A defendant "has no legitimate choice when he is led to believe that a search is inevitable when, in fact, it is not" because "the police falsely claim . . . that they will or can obtain a warrant." *Munoz*, 2013 WL 6638922, at *4.

In this case, to obviate a finding of coercion or deceit, the government must prove that when Agent Sylvia presented Defendant with his two options on his front porch, there was a high degree of certainty to his claim that he could obtain a search warrant for Defendant's residence should he choose to do so. *See United States v. Vasquez*, 638 F.2d 507, 529 (2d Cir. 1980) (noting Second Circuit "has upheld a finding of consent in circumstances where officers stated that they could apply for a warrant and would 'no doubt' obtain one"); *Faruolo*, 506 F.2d at 494-95 (noting that the district court had found that the officer's "advice was well grounded" and that there "was no deceit or trickery" when the officers stated that they could apply for a warrant); *Calvente*, 722 F.2d at 1023 (holding that the statement that an agent "could obtain a warrant," which was "clearly true in light of the ample evidence of illegal activity, does not vitiate the consent" and "does not constitute coercion").

To sustain its burden of proof on this issue, the government relies on the search warrant affidavit. The search warrant affidavit, however, inaccurately describes the events of May 29, 2013. It indicates that all of Defendant's admissions were made on his front porch, prior to his alleged consent and prior to the agent's entry into his residence, when in fact the only statement Defendant made on his front porch was that "there's nothing in [the residence] and that there's just some stuff for my head." (Tr. 1/2/14 at 17:17-18.) This statement, coupled with the historical information set forth in the search warrant affidavit, must establish probable cause if Agent Sylvia's statements to Defendant are to be deemed truthful and non-coercive.

"[P]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v.*

*Gates*, 462 U.S. 213, 238 (1983)). There must be a "required nexus between the items sought and the 'particular place' to be searched." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Stanford v. Texas*, 379 U.S. 476, 481 (1965)). "'Once it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978) (quoting *United States v. Mfrs. Nat'l Bank of Detroit*, 536 F.2d 699, 703 (6th Cir. 1976)).

"To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Additionally, "the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).

Here, the search warrant affidavit contains limited, historical information regarding Defendant's alleged involvement in marijuana trafficking during the 2007 and 2011 time period. None of this alleged activity took place in Defendant's residence. The information is derived from a single confidential informant who previously worked on Defendant's farm and whose credibility is established only by conclusory statements regarding the reliability of his or her past information together with a statement that the confidential informant made successful drug purchases at the DEA's direction. The affidavit recites that the informant received unspecified remuneration for his or her services and unspecified consideration for unspecified pending criminal charges. The informant's claims are allegedly corroborated by a 2011 recording which contains a vague and ambiguous reference to something that needs to be dug out, which the affidavit concludes is a reference to marijuana concealed by Defendant in a hay bale.

"In determining what constitutes probable cause to support a search warrant when the warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of the circumstances' bearing upon its reliability." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 230-31). Factors to consider include "an informant's veracity, reliability and basis of knowledge, and the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (internal quotation marks and citations omitted). "[B]ecause the informant's interest in obtaining leniency creates a strong motive to supply accurate information, . . . a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify." *Id.* at 236 (internal quotation marks, citations, and alterations omitted); *see also United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("An inquiry into the reliability of an informant's information is usually of two general types, not necessarily mutually exclusive: an inquiry into an informant's veracity and an inquiry into the quality of his sources of knowledge of the information."). An "officer's statement that 'affiants have received reliable information from a credible person and believe' that [narcotics are] stored in a home [is] inadequate'" to provide a basis for determining probable cause because it is "a mere conclusory statement that gives . . . virtually no basis at all for making a judgment regarding probable cause." *Gates*, 462 U.S. at 239 (quoting *Aguilar v. Texas*, 378 U.S. 108, 109, 114-15 (1964)).

The search warrant in this case provides little, if any basis, for the magistrate judge to evaluate the confidential informant's reliability. Moreover, the information provided is clearly dated. Although the government is correct that in an ongoing enterprise such as drug trafficking, the Second Circuit has never endorsed "an arbitrary 'cut-off' expressed in days or weeks beyond which probable cause ceases to exist," *United States v. Beltempo*, 675 F.2d 472, 478 (2d Cir. 1982), the search warrant affidavit cites no evidence to support a conclusion that Defendant's participation in the alleged marijuana trafficking conspiracy was continuing in May of 2013. *Cf. United States v. Ortiz*, 143 F.3d 728, 732-33 (2d Cir. 1998) (concluding probable cause was not "impaired by

staleness" because of "the continuous nature of the narcotics conspiracy that [was] charged in the indictment and described in the supporting affidavit" and because "contemporary information included specific references to drug activity" in January and February 1995 involving the residence for which warrant was issued in February 1995); *Smith*, 9 F.3d at 1014 (concluding warrant not stale when issued "within hours" of second controlled buy, despite seven week gap between first and second controlled buys); *see also United States v. Morales*, 851 F. Supp. 112, 117 (S.D.N.Y. 1994) (concluding information concerning presence of guns in apartment not stale and finding probable cause when "both defendant's involvement in the narcotics conspiracy and his storage of firearms at the apartment were ongoing in nature").

As for the nexus between Defendant's marijuana trafficking in 2011 and the evidence that would be found in his home in 2013, the government relies on the search warrant affidavit's statement that "it is common for drug traffickers and distributors to conceal . . . records pertaining to their drug manufacture and drug transactions, in secure locations within their residence." (Doc. 1-3 at 5; Doc. 23-1 at 8.) Probable cause to search a residence, however, generally requires more than a single boilerplate statement that, in an agent's experience, individuals often keep documents in their residence related to a criminal enterprise after it has ceased. *See, e.g., Singh*, 390 F.3d at 181-82 (concluding twenty months between witness's last date of employment with defendant and search warrant application for defendant's residence did not vitiate probable cause because there was evidence in the affidavit that defendant "continued to maintain business records evidencing fraud at his residence," based on witness describing records revealing health care fraud and maintenance of those records by defendant's wife at the residence, coupled with evidence that "activity at the residence was of a continuous and protracted nature"); *United States v. Gayle*, 2009 WL 4667093, at *4 (S.D.N.Y. Dec. 8, 2009) (concluding evidence for search warrant seeking "documents, ledgers, and other records" of narcotics trafficking not stale when, among other considerations, the supporting affidavit alleged that the confidential informant "saw a notebook containing a ledger, in which [defendant] recorded the dates and amounts of narcotics shipments" and

"the amounts owed to him" when the confidential informant met defendant in defendant's apartment seven months prior to search warrant for the apartment); *United States v. LaMorte*, 744 F. Supp. 573, 575-76 (S.D.N.Y. 1990) (addressing search warrant issued in 1988 for residence that concerned a "massive" drug trafficking enterprise from 1971 to 1984 and concluding evidence was not stale when the affidavit "identified the specific items which likely remained [in the residence] long after . . . criminal activity may have ceased," including that defendant used and kept in his residence a "detailed ledger charting his sales of marijuana by grade and price," that defendant "travelled extensively in connection with his drug smuggling activities" and would have a passport in his residence evidencing that travel, and that defendant received at his residence correspondence in the months preceding the search warrant from a convicted drug smuggler). As a result, a general and conclusory statement regarding the possibility of records in Defendant's home did not render it "clearly true," *Calvente*, 722 F.2d at 1023, that probable cause to search Defendant's residence existed when Agent Sylvia presented Defendant with his two options.

The government's further and repeated suggestion that there was additional, more current information regarding Defendant's alleged marijuana trafficking that was not included in the warrant application is unsupported by the facts. Agent Sylvia was given an opportunity to identify this alleged information and the most recent information he cited was an undetailed report of unknown reliability regarding an unspecified subject matter obtained in January 2013. Even were the court to credit the existence of this undisclosed information, it would have no basis to further conclude that it supported a finding of probable cause.

Because the court cannot find that the issuance of a search warrant was inevitable or even likely when Agent Sylvia approached Defendant with the option to either consent or await a warrant, it cannot find that Agent Sylvia obtained Defendant's consent free from coercion or deceit or that his show of authority was lawful. Based upon the totality of the circumstances, the government has therefore failed to sustain its burden of establishing by a preponderance of the evidence that Defendant's consent to the search of

24

his residence was "the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority," *Moreno*, 701 F.3d at 76 (internal quotation marks and citations omitted). The search of Defendant's residence therefore violated the Fourth Amendment and rendered the evidence gleaned from the search the fruits of an unconstitutional search. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence (Doc. 23) is GRANTED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this  25th  day of February, 2014.

Christina Reiss, Chief Judge
United States District Court